IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02913-NRN

SECURENET SOLUTIONS GROUP, LLC, a Florida corporation,

Plaintiff,

v.

SENSTAR CORPORATION, a Canadian company,

Defendant.

---

**ORDER ON**
**DEFENDANT'S MOTION TO DISMISS PURSUANT**
**TO FED. R. CIV. P. 12(b)(6) (Dkt. #12)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

 This matter presently is before the Court on Defendant Senstar Corporation's ("Senstar" or "Defendant") Motion to Dismiss for Failure to State a Claim Pursuant to Fed. R. Civ. Pro. 12(b)(6), filed December 12, 2019. Dkt. #12. Plaintiff SecureNet Solutions Group, LLC ("SecureNet" or "Plaintiff") filed its Response to the Motion to Dismiss on January 23, 2020. Dkt. #27. Defendant filed its Reply on February 13, 2020. Dkt. #32. I heard argument on the Motion for approximately 90 minutes on February 27, 2020. *See* Dkt. #33.

 The Parties have consented to my jurisdiction to hear this case for all purposes, including trial. Dkt. #19. Consistent with the Parties' consent, on January 13, 2020, Judge Brimmer issued an order of reference pursuant to 28 U.S.C. §636 referring the case to me. Dkt. #21.

Defendant Senstar moves to dismiss this patent infringement lawsuit on the ground of patent ineligibility. Senstar argues that the patents issued to Plaintiff SecureNet improperly seek a patent on an abstract idea. Having considered the briefing and the oral arguments of the Parties, Defendant's Motion to Dismiss will be **DENIED**.

## Jurisdiction

This is a patent infringement lawsuit. Because this action arises under the patent laws of the United States, this Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## Description of the Patents at Issue

SecureNet claims that Senstar, specifically via its Symphony Video Management Systems and Senstar E-Series and R-Series Network Video Recorders, infringe a number SecureNet's patents. SecureNet's complaint alleges five counts asserting violation of the following five patents (collectively the "Patents" or "Patents-at-issue"):

- United States Patent No. 7,737,837 (the "'837 Patent"), entitled "Hierarchical data storage manager, anonymous tip process engine, and a vehicle information processing engine for security and safety applications."

- United States Patent No. 8,013,738 (the "'738 Patent"), entitled "Hierarchical storage manager (HSM) for intelligent storage of large volumes of data."

- United States Patent No. 8,130,098 (the "'098 Patent"), entitled "Systems and methods for safety and business productivity."

- United States Patent No. 8,354,926 (the "'926 Patent"), entitled "Systems and methods for business process monitoring."

- United States Patent No. 8,730,040 (the "'040 Patent"), entitled "Systems, methods, and apparatus for monitoring and alerting on large sensory data sets for improved safety, security, and business productivity."

The asserted Patents all share a common specification. They claim priority directly or indirectly to a U.S. patent application filed on October 4, 2007. The parent patent application, U.S. Serial No. 11/867,244, issued as U.S. Patent No. 7,382,244, is not asserted in this action.

The Patents-at-issue relate generally to security and surveillance systems. Broadly speaking, the claimed inventions involve sensors, connected to a database, allowing for analysis of various sensory data inputs, correlating the inputs from the sensors with historic information stored in the database, and then prompting "alerts," allowing for actions to be taken.

For example, the '837 Patent describes the field of the invention as relating to "an intelligent security and surveillance system having alerts correlated using sensory data from one or more sensors, the sensory data weighted by attribute data representing information about the source of the sensory data." Dkt. #1-1 at 17. The invention purportedly "may be used to fight crime, detect and possibly prevent terrorist activity, and help ensure safety procedures are followed." *Id.* The "Hierarchical Storage Manager" or "HSM" aspect of the '837 Patent describes a hierarchy of data storage devices that includes (at least) a first-tier device and a second-tier device, the first tier device having a high data access performance and a lower storage capacity than the second-tier device. *Id.* at 18.

With video and other sensory devices generating reams of data of varying quality, the invention anticipates a system including program code to manage the storage and cascading of the sensory data in the hierarchy of storage devices, based on the attribute data corresponding to the source of the sensory data. *Id.* High volume, low quality, or reliable data would be stored in low data access performance storage devices, while high quality data would be stored in high performance (lower storage capacity) storage devices. This purports to address an identified problem of a security system with perhaps 100 surveillance cameras around a facility, generating hundreds of terabytes of data per month. The HSM "plays an important role in providing large amounts of permanent data storage in a cost-effective manner." *Id.* at 22. Important to the process is the assignment of probabilistic weights to the data generated by the sensory devices, so that the data can be stored in the appropriate storage device by weighted average of the attributes based on its perceived quality and reliability. *Id.* at 19, 23. According to the "Background of the Invention" section of the Patent, what the inventors recognized was a need for a "method, apparatus, and system of alerting that weights input data from disparate systems to lower false alarm rates and to filter out unwanted, spurious, or intentionally distracting information." *Id.* at 17.

With respect to the '738 Patent, one embodiment is a "video surveillance, storage and alerting system" including the following components: one or more surveillance cameras capturing video data having attribute data, with the attribute data representing the relative importance of the surveillance cameras; one or more video analytics devices processing the video data and detecting primitive video events; a network management module monitoring the network status of the surveillance cameras; a

correlating engine correlating two or more primitive video events from the video analytics devices; and an "alerting engine" that generates one or more alerts and performs one or more actions based on the correlation performed by the correlation engine. Dkt. #1-3 at 17.

With respect to the '098 Patent, the detailed description of the invention explains that it "provides a system, a method, and an apparatus for surveillance, storage and alerting." Dkt. #1-5 at 18. The invention "collects, stores, and correlates data from various sensory devices (such as video data from video cameras), as well as meta-data about the collected data, and generates one or more intelligent alerts based on meta-data and attribute data of the devices used to detect the meta-data." *Id.* Meta-data is data about the data, but it can also include compound events and correlated events. Meta-data also includes "information added manually by a human reviewer, such as a person who reviews a video tip, or a transcriber of video speech." *Id.* The invention description for the '098 Patent continues by describing "primitive events" that can be picked up by the various sensors. Such primitive events may be generated automatically by various sensory devices or may be generated in software based on data from sensory devices. By example, a camera may generate an event corresponding to the presence of a person, a gunshot detection component may generate a primitive event indicating that gunshot was detected. A primitive event may even be created by a human operator adding meta-data indicating that "suspicious activity was observed at this location." *Id.* In one embodiment of the invention, a network management module monitors the network status of surveillance cameras, and video analytics devices, and generates network events reflective of the network status of all

subsystems. A correlation engine then correlates two or more primitive video events from the video analytics devices weighted by attribute data of the surveillance cameras used to capture video data, and network events weighted by attribute data of device corresponding to the network event. An alerting engine will then generate one or more alerts and perform one or more actions based on a correlation performed by the correlation engine. *Id.* at 17.

The '926 Patent purports to be describe "systems and methods for business process monitoring." Dkt. #1-7 at 17. It is a continuation of the '098 Patent and it too covers a "video surveillance, storage, and alerting system" having similar components to those described in the '098 Patent.

Finally, the '040 Patent is titled "System, Methods and Apparatus for Monitoring and Alerting on Large Sensory Data Sets for Improved Safety, Security and Business Productivity." The abstract of the '040 Patent describes a "process monitoring method" comprising the steps of capturing sensory data from one or more sensors, storing the sensory data from those sensors in a data storage device, processing the sensory data to detect primitive events, correlating two or more primitive events to determine one or more correlated events, and performing one or more actions based on the correlation performed, "including sending alerts to recipients in a company's hierarchy." Dkt. #1-9 at 1. The abstract for the '040 Patent notes that the process monitoring method "can be used with a variety of sensors, including temperature, pressure, revolutions per minutes, electrical meters, altitude meters, and speedometers, and accept input from a variety of legacy systems, including financial systems, inventory systems, personnel systems, currency systems, and law enforcement databases." *Id.*

Plaintiff SecureNet asserts that the '040 Patent "highlights a multi-stage approach that effectively narrows the 'focus of attention' from troves of live sensory data by reducing them to specific actionable events stored as meta-data, which may be used to create intelligent alerts. The claimed methods are therefore very efficient and can be used in a variety of applications involving security and surveillance systems." Dkt. #27 at 30.

SecureNet describes the Patents as being directed to "reducing false alarms in existing computerized security systems." *Id.* at 6. They accomplish this "by (1) accounting for disparate qualities of data obtained from multiple sensors; (2) correlating data obtained at different times from various types of sensors located in different geographical locations; (3) improving system processing by the use of hierarchical storage based on determining importance of collected data, among other improvements such as normalizing data to offset incompatible data protocols or to incorporate legacy security systems, such as analog video and card access systems." *Id.* SecureNet says the Patents delineate at least 15 embodiments (and further refinements) and explain how they are implemented. *Id.*

An example of one embodiment of the '926 Patent is found in a detailed scenario description of the invention:

> Consider another scenario corresponding to a stalker. On day 1, a car loiters outside a dormitory for an hour. The loitering event is detected, stored, and indexed, but no alert is generated. On day 2, the car again loiters outside the dormitory for an hour. The loitering event is detected, stored, and indexed, but no alert is generated. A woman in the building reports that she is being stalked. The security guard queries for multiple instances of loitering cars over the past two days. The security guard identifies the vehicle of the stalker (and writes down the license plate number), and confirms that stalker's identity with the woman. The security guard runs the license plate through law enforcement databases as

previously described and checks for outstanding warrants, which come back as negative. The security guard then creates a new rule to generate an alert when vehicles loiter outside this particular building. On day 3, the car again loiters outside the dormitory. An alert is generated by the system based on the new rule and sent to the security guard. The security guard positively identifies the car as the same car as in the previous occasions. Finally, the security guard dispatches the police to stop the vehicle and inquire into the driver. A possible rape, stalking incident, violence or altercation may have been prevented.

Dkt. 1-7 at 37.

At oral argument on the Motion, SecureNet's counsel provided a further illustration of an embodiment of Claim 1 of the '040 Patent. Claim 1 of the '040 Patent describes a monitoring system, comprising of sensors, linked to legacy systems external to the sensors, coupled to one or more data storage devices for storing the sensory data from the sensors. All of this is connected to one or more processors that can take primitive sensory events (weighted based on the data quality of the sensors), process information from the legacy systems to detect one or more primitive legacy events, and perform historical correlations to "automatically analyz[e] said primitive sensory and legacy events across time or space for one or more historical correlations between primitive and sensory and legacy events." Dkt. #1-9 at 40. Ultimately, the system would "initiate one or more actions based on said one or more critical events." *Id.*

The example given at oral argument was the scenario of a "return customer" at a retail store. One of the sensors might be a facial recognition device (camera). A legacy system might be a Point of Sale database, such as a smart cash register, which records what the customer had previously purchased and is linked to a database. When the customer returns to the store, the facial recognition camera/software identifies the

customer, and the customer's historic purchases are correlated with the fact the customer is now present in the store. The correlation engine matches the presence of the customer in the store with the customer's historic purchasing profile, and the system can take action by, for example, sending a message to a sales attendant, notifying the attendant of the customer's presence and past purchasing profile and shopping habits, in order to better make suggestions or recommendations to the customer.

As a general matter, SecureNet claims its inventions "improve existing computerized surveillance systems by events correlated based on weighted attribute data." Dkt. #27 at 35. They also constitute, in SecureNet's view, improvements "in the field of computerized surveillance systems by implementing the [Hierarchical Storage Manager], a unique way of cascading data to slower mediums, reserving faster processing for data of greater 'importance'." *Id.* SecureNet also argues that "the use of attribute data of sensors to reduce error rate is a concrete solution to a real-world problem in assigning reliability to sensors that are unequal in data quality based on a multitude of technical factors." *Id.* at 35–36.

## **Defendant Senstar's Motion to Dismiss**

In its Motion to Dismiss, Defendant Senstar asserts that the Patents-at-issue are invalid under 35 U.S.C. § 101 as directed to the abstract idea of collecting data from a number of sources (such as video cameras or motion sensors), analyzing the data, and taking action in response to the result of the data analysis. Senstar characterizes the Patents as being drawn "to a security system that collects data from multiple sources, ascribes a different level of credibility to the data based on its source, and analyzes the data to provide an output, such as triggering an alarm." Dkt. #12 at 7. Senstar notes that

the sensors are well-known and generic and that the system runs on generic computer hardware that is not arranged in any particularly innovative manner and does not function in any new or innovative manner. *Id.* at 3.

As the primary basis for its dismissal motion, Senstar points to the Supreme Court's decision in *Alice Corp. Pty. Ltd. V. CLS Bank Int'l*, 573 U.S. 208 (2014), which first applied to the digital/computer age the principle that an idea itself is not patentable.

Abstract ideas are not patentable, and in *Alice,* the Supreme Court arguably concluded that the mere implementation of an abstract idea using nothing more than generic computing equipment is equally unpatentable. Defendant Senstar insists that while the Patents-at-issue are related to security and surveillance systems, they are in truth directed to the abstract idea of collecting data on suspicious activity (or potentially any activity, such as a shopper entering a store), analyzing the data, and taking action in response to the result of the data analysis, actions that "[s]oldiers, police officers, sentries, and other types of security guards" have been performing "since time immemorial." Dkt. #12 at 5.

Senstar particularly relies on the case of *Electric Power Group, LLC v. Alston S.A.*, 830 F.3d 1350 (Fed. Cir. 2016). Senstar asserts the patents deemed invalid in *Electric Power* are identical in material respects to the patents asserted here. In *Electric Power*, the Federal Circuit applied the rule articulated *Alice* to invalidate patents claiming systems and methods for performing real-time monitoring of an electric power grid by collecting data from multiple data sources. The *Electric Power* court found that while the patents described systems and methods for performing monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data,

and displaying the results, they were directed to abstract ideas, and the patents did not contain elements sufficient to transform the claims into patent-eligible subject matter. The claims did not require a new source or type of information or new techniques for analyzing it; did not require any arguably inventive set of components or methods, such as measurement devices or techniques that would generate new data; and did not invoke any assertedly inventive programming. Nothing in the *Electric Power* claims, understood in light of the specifications, required anything other than an off-the-shelf conventional computer, network, and display technology for gathering, sending, and presenting desired information. 830 F.3d at 1354–55.

The *Electric Power* court found that the claims in that case did not "include any requirement for performing claimed functions of gathering, analyzing, and displaying in real time by use of anything but entirely conventional, generic technology." *Id.* at 1356. "The claims therefore do not state an arguably inventive concept in the realm of application of the information-based abstract ideas." *Id.* Citing the district court decision, the *Electric Power* court explained the "common-sense distinction between the ends sought and particular means of achieving them, between the desired results (functions) and particular ways of achieving (performing) them." *Id.* Said the Federal Circuit said, quoting the district judge, "[t]here is a critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general." *Id.*

Chief Judge Philip A. Brimmer of this Court issued a similar decision in *Concaten, Inc. v. Ameritrak Fleet Solutions, LLC,* 131 F.Supp.3d 1166 (D. Colo. 2015), rendering judgment on the pleadings in a patent infringement case that had alleged

infringement of patents directed toward relaying weather and road data to and from snowplows. Applying the precedent of *Alice*, Judge Brimmer found that the representative claim was directed to the abstract idea of collecting information from a vehicle and transmitting that information over a network. The patents in *Concaten* did "not describe any new device or improvement in any specific device that would convert the scope of its claims from abstract idea to patent-eligible innovation." *Id.* at 1173.

Relying on the principles articulated in *Alice* and *Electric Power* and described by Chief Judge Brimmer in *Concaten*, Defendant Senstar insists that the Patents-at-issue in this case are invalid under § 101 as attempts to patent an abstract idea.

## Standard for Rule 12(b)(6) Motion for Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). "A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1198 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts

which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In the patent context, a Rule 12(b)(6) motion to dismiss may be a proper vehicle to determine patent eligibility under 35 U.S.C. § 101. *Generic Techs. Ltd. V. Merial L.L.C.*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016). Claim construction is not required prior to conducting a § 101 analysis when it is apparent from the patent that the asserted claims are not directed to eligible subject matter. *Id.* at 1374. *See also Content Extraction & Transmission, LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) ("Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101."). However, plausible factual allegations may preclude dismissal of a case where "nothing on the record . . . refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)." *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016).

In this case, there are five patents with dozens of dependent claims for each patent, totally approximately 300 separate claims. Despite the multitude of claims, in making the analysis of patent ineligibility under § 101, the Federal Circuit has held that addressing each claim is unnecessary when "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348.

## Considering Affidavits on Rule 12(b)(6) Motion

Plaintiff SecureNet acknowledges that whether a claim recites patent eligible subject matter pursuant to § 101 is a question of law. However, citing *Burkheimer v. HP,*

*Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), SecureNet also suggests that a motion to dismiss based on § 101 may nevertheless raise underlying issues of fact. One such fact determination is "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent." *Id.* at 1368. SecureNet argues that in this case there are disputed factual issues regarding the application of § 101 incapable of resolution at the motion to dismiss stage.

In support of this position, SecureNet has supplied affidavits previously filed in other litigation where some of these same Patents were challenged under § 101. *See* Dkt. ##27-1 & 27-2. The affidavits come from the case of *SecureNet Solutions Group, LLC v. Tyco Integrated Security, LLC*, 17-cv-10559-NMG (D. Mass). One affidavit, dated August 14, 2017, is by Mukul Shirvaikr, Professor of Electrical Engineering at the University of Texas at Tyler. The other is dated August 15, 2017, by Richard Helfers, Assistant Professor of Criminal Justice at the University of Texas. Professor Shirvaikr's affidavit comments on the subject matter of the Patents-at-issue, "as they would be understood by one of skill in the art, taking into account the state of relevant technology in 2006-07, when the inventions were conceived and the applications filed." Assistant Professor Helfers' affidavit addresses the subject matter of the Patents from the perspective of a police officer or a security guard, disputing whether the Patents are directed at the "abstract idea of collection data on suspicious activity and taking action based on that analysis." Assistant Professor Helfers states that the substance of the asserted Patents is not directed at the kinds of duties that security guards perform, but instead is directed at "problems that exist within the realm of computers—problems that

security guards have never been tasked with performing." In response, Defendant Senstar argues that these affidavits should not be considered on a Motion to Dismiss.

The rule is that on a motion to dismiss under Rule 12(b)(6), a district court may generally consider only alleged facts and documents that are part of or are incorporated into the complaint. Rule 12(d) provides that if "matters outside the pleading are presented to and not excluded by the court, [a Rule 12(b)(6) motion] shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Certain documents, like the Patents-at-issue here, are considered to "merge into" the pleadings because the Complaint's factual allegations are linked to and dependent upon the Patents.

But the expert affidavits provided by Plaintiff SecureNet are not the kind of documents of which the Court can take judicial notice in deciding a Rule 12(b)(6) motion. I decline to consider them and decline to convert the motion to dismiss into a motion for summary judgment. *See Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 755 (Fed. Cir. 2019) (holding that district court did not abuse its discretion in refusing to consider plaintiff's expert declaration and refusing to convert 12(b)(6) motion into one for summary judgment).

**All the claims are tied to the same idea.**

In making my analysis of patent eligibility under § 101, I agree with Defendant Senstar that the Patents and claims at issue are substantially similar and are linked to the same general idea. All involve using sensors to collect information, weighing the

relative importance of the data from the sensors, storing the data in a hierarchical

database, and issuing an alert based on an analysis of the data.

As noted, the '837 Patent describes the field of the invention as relating to "an

intelligent security and surveillance system having alerts correlated using sensory data

from one or more sensors, the sensory data weighted by attribute data representing

information about the source of the sensory data." Dkt. #1-1 at 17. The '926 Patent, '098

Patent, '738 Patent, and '040 Patent all share a common specification with the '837

Patent and are continuations of the same parent application. They all claim the same

basic systems and methods for monitoring systems by collecting data from sensors,

analyzing the data, and providing an output. Although each patent couches its

respective claims as relevant to a different process, outside of their intended use, the

claims themselves are nearly identical. The '837 Patent and the '738 Patent both claim

an "alerting system" (Claim 1); the '098 Patent claims a "safety system" (Claim 1); the

'926 Patent claims "a business process monitoring system" (Claim 1); and the '040

patent claims a "monitoring system" (Claim 1).

Therefore, I agree with the Defendant that in making the analysis of patent

ineligibility under § 101, I need not address each claim of each patent separately. *See*

*Content Extraction*, 776 F.3d at 1348.

**Discussion**

**What is patent-eligible?**

35 U.S.C. §101 defines patentable subject matter as "any new and useful

process, machine, manufacture, or composition of matter, or any new and useful

improvement thereof." The Supreme Court, however, "has long held that this provision

contains an important implicit exception[:] Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc*, 569 U.S. 576, 589 (2013) (quoting *Mayo Collaborative Servs. v. Prometheus Lebs., Inc.,* 566 U.S. 66, 70 (2012)). This case involves the abstract idea exception.

The Supreme Court has set forth a two-step analytical framework to identify patents that claim abstract ideas. *Alice*, 573 U.S. at 217. The first inquiry asks "whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* (citing *Mayo*, 566 U.S. at 77–78). If this threshold determination is met, the next step is to "search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* at 217–18 (quoting *Mayo*, 566 U.S. at 72–73). At the second stage, the court must determine "whether the limitations present in the claims represent a patent-eligible application of the abstract idea." *Content Extraction*, 776 F.3d at 1347. The court should ask, "What else is there in the claims before [it]?" *Alice*, 573 U.S. at 217. The court must consider whether the claims contain an "inventive concept," such that the elements of the claim (individually or as an "ordered combination") "transform the nature of the claim into a patent eligible application." *Id.* The second step is intended to ensure that the patent "in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* "For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction,* 776 F.3d at 1347–48 (quoting *Alice,* 573 U.S. at 225).

The Supreme Court has cautioned that courts must 'tread carefully" in construing the exceptions to § 101 "lest it swallow all of patent law." *Alice*, 573 U.S. at 225 (citing *Mayo*, 566 U.S. at 71). However, "abstract ideas are the basic tools of scientific work," and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Id.* at 216 (internal quotations and citations omitted). Thus, in applying the § 101 "abstract idea" exception, courts must "distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more." *Id.* at 217.

Unfortunately, neither the Supreme Court nor the Federal Circuit have established a "definitive rule" to determine what constitutes an "abstract idea" under the first step of the *Alice* inquiry. "Rather both [the Federal Circuit] and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).

I must say that this is really no meaningful standard at all. *See Affinity Labs of Texas LLC v. DirecTV LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) (acknowledging that "precision has been elusive in defining an all-purpose boundary between the abstract and the concrete") (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015)). My colleague on this Court, Judge Martinez, recently identified the difficulty in applying this area of patent law:

> The proper application of the Supreme Court's *Alice* standard is an evolving and sometimes hazy area of law. Deciding whether a patent claim is "directed to" a law of nature is not as straightforward as the Supreme Court makes it sound in *Alice* itself. Moreover, the Federal Circuit itself has remarked on the difficulty, at times, of distinguishing the first *Alice* inquiry from the second, *see, e.g., Elec. Power Grp., LLC v.*

> *Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); or distinguishing the
> two *Alice* inquiries (comprising a patentability analysis rooted in 35 U.S.C.
> § 101) from other common inquiries such as anticipation and obviousness
> (which are rooted in 35 U.S.C. §§ 102–03), *see, e.g., Rapid Litig. Mgmt.*
> *Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1052 & n.2 (Fed. Cir. 2016).

*United Cannabis Corp. v. Pure Hemp Collective Inc.,* No. 18-CV-1922-WJM-NYM, 2019

WL 1651846 (D. Colo. April 17, 2019). Determining whether a claim is directed at an

abstract idea, and is therefore not patent eligible under § 101, seems almost like the

"know it when I see it" definition of obscenity, but transposed to the patent context. *See*

*Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J, concurring) ("I shall not today

attempt further to define the kinds of material I understand to be embraced within that

shorthand description ['hard-core pornography'], and perhaps I could never succeed in

intelligibly doing so. But I know it when I see it, and the motion picture involved in this

case is not that."). It seems that even a former chief judge of the Court of Appeals for

the Federal Circuit cannot predictably know an abstract idea, even when he sees it,

given this ever-changing and confusing legal standard:

> In my view, recent cases are unclear, inconsistent with one another and
> confusing. I myself cannot reconcile the cases. That applies equally to
> Supreme Court and Federal Circuit cases. Nor can I predict outcomes in
> individual cases with any confidence since the law keeps changing year
> after year.

Testimony of former Chief Judge Michel of the Court of Appeals for the Federal Circuit

before Subcommittee on Intellectual Property, U.S. Senate Committee on the Judiciary,

June 4, 2019.

Nevertheless, one must press on. Per the Federal Circuit, the "inquiry is not an

unbounded one." *Affinity Labs*, 838 F.3d at 1258. And the Federal Circuit's numerous

decisions applying the two-stage *Mayo/Alice* inquiry are supposed to provide

"substantial guidance in determining whether claims are unpatentable under the 'abstract idea' rubric." *Id.*

In applying the *Alice* standard (or quasi-standard), the Federal Circuit *has* made clear that merely executing or implementing an abstract idea on a generic computer is not enough to move from the unpatentable to the patentable realm. *See Fairwarning IP, LLP v. Latric Sys., Inc.,* 839 F.3d 1089, 1095 (Fed. Cir. 2016). At the same time, the first step question is not simply "whether the claims involve a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions involves a law of nature and/or natural phenomenon." *Enfish,* 822 F.3d at 1334. Instead, the inquiry is whether the character of each claim, considered as a whole and in light of the specification, "is directed to an excluded subject matter." *Id.* at 1335.

### Applying the *Alice* Test: Step One

I agree with Defendant Senstar that, under step one of the *Alice* framework, the claims of the Patents are directed at an abstract idea. The claims are directed to (1) collecting data from sensors, (2) storing the data in storage devices, (3) analyzing the data, and (4) providing an output—or an "alert" to be acted upon. The Federal Circuit has stated that each of these steps is an abstract idea.

There are two Federal Circuit cases that I find analogous to the issues in this case. As described above, *Electric Power* involved patents describing systems and methods for performing real-time performance monitoring of an electrical power grid by collecting data from multiple data sources, analyzing the data, and displaying the results. The Federal Circuit concluded very quickly that the claimed process of collecting information, analyzing it, and displaying certain results was focused on an

abstract idea. This is because "[i]nformation as such is an intangible." 830 F.3d at 1353.

Accordingly, the Federal Circuit has "treated collecting information, including when

limited to particular content (which does not change its character as information), as

within the realm of abstract ideas." *Id.* In addition, the Federal Circuit has treated

"analyzing information by steps people go through in their minds, or by mathematical

algorithms, without more, as essentially mental processes within the abstract-idea

category." *Id.* at 1354.

In *In re TLI Communications LLC Patent Litigation*, 823 F.3d 607 (Fed. Cir.

2016), the claimed invention was a "method for recording and administering digital

images," which entailed "recording images using a digital pick up unit in a telephone

unit," storing the images as digital images, transmitting the digital images and

classification information to a server, and then storing the digital images in the server in

light of the classification information. *Id.* at 610. The court held that the claim was drawn

to the abstract idea of classifying an image and storing an image based on its

classification. While the claim required the use of concrete, tangible components such

as a telephone unit and a server, the court noted that the specification made clear that

the recited physical components "merely provide a generic environment in which to

carry out the abstract idea of classifying and storing digital images in an organized

manner." *Id.* at 611. The court explained that the specification "does not describe a new

telephone, a new server, or a new physical combination of the two," but instead

"describes the system and methods in purely functional terms." *Id.* at 612. Thus, the

court concluded, the claims "are not directed to a solution to a 'technological problem.'"

*Id.* at 613.

In the instant case, the asserted Patents require an "analysis" to be performed by giving greater weight to more reliable sources than less reliable sources. But this does not change my conclusion that the Patents are directed at an abstract idea because weighing information by source is also an abstract idea. The human mind does this all the time with information from whatever source, depending on historic reliability. Indeed, the weighing process described in the patents, while purporting to be automated via use of an algorithm, appears to be merely the subjective assignment of a weight number by a human assessor. The asserted Patents appear to be merely an effort to computerize and analyze more quickly, and perhaps with more precision, that which humans, for example security guards or retail salespeople, have always done.

In fact, the example of the "return customer" at the clothing store presented at oral argument makes this point clearly. A haberdasher might have a customer one day and sell a particular kind of hat or scarf that the customer expressed an interest in. A good haberdasher will remember the customer and the customer's preferences. When the customer returns, the hat-seller recognizes the customer and logically thinks to propose new items for sale consistent with the customer's prior purchases. Pre-computer, a conscientious retailer might have maintained a list of each customer's sizes, color, and fabric preferences. On seeing a customer return to the store, the retailer might have pulled the customer's "file," recalling recent purchases. Plaintiff's description of the business system patent embodiment via a facial recognition sensor, and correlation with a point-of-sale database, is merely a computerized form of what a superior hat shop owner would traditionally have done. Similarly, at a high level, the application of the Patents to the security context is similar to what security guards have

always done. "[T]he speed increase comes from the capabilities of a general-purpose computer, rather than the patented method itself." *Fair Warning IP, LLC v. Iatric Systems, Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016).

SecureNet insists that the inventions do involve an improvement in the field of computerized surveillance systems by implementing the "HSM," the hierarchical storage management system: "a unique way of cascading data to slower mediums, reserving faster processing for data of greater 'importance.'" Dkt. #27 at 35. SecureNet argues that the claimed HSM is not an abstract concept but is instead a real-world solution to a recognized problem in smart security systems. SecureNet also argues that the use of attribute data of the sensors to reduce the error rate is a concrete solution to a real-world problem in assigning reliability to sensors that "are unequal in data quality based on a multitude of technical factors." *Id.* at 36.

I disagree. If anything, the hierarchical storage management system and the weighting of attribute data from the sensors to reduce errors rates should be considered at step two of the *Alice* analysis. In terms of step one, I find that the patents are drawn to abstract ideas.

### Applying *Alice* Step Two

Having determined that the claims at issue are drawn to the abstract ideas of collecting information from sensors, comparing that information to historical information stored in a memory or database, and then issuing an alert based on a comparative analysis of the sensor data to the historic information, I must now turn to the second step of the *Alice* analysis.

In applying step two of the *Alice* inquiry, the task is to "determine whether the claims do significantly more than simply describe [the] abstract method" and thus transform the abstract idea into a patentable subject matter. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014). A court applying step two looks to see whether there are any "additional features" in the claims that constitute an "inventive concept" thereby rendering the claims eligible for patenting even if they are directed to an abstract idea. *Alice*, 573 U.S. at 221. Those "additional features" must be more than "well-understood, routine, conventional activity." *Mayo*, 566 U.S. at 78; *Ultramercial*, 772 F.3d at 715; *Affinity Labs*, 838 F.3d at 1262. A claim that simply recites the use of "generic features," such as storage medium or a graphical user interface, as well as "routine functions," such as transmitting and receiving signals, to implement the underlying idea does not pass the second step test. *Affinity Labs,* 838 F.3d at 1262–63. More generally, simply appending "conventional steps specified at a high level of generality" to an abstract idea does not make that idea patentable. *Id.* (quoting *Mayo*, 566 U.S. at 82).

In making this assessment, I am to examine each claim limitation, alone and in combination with other limitations, to determine whether any of the claims contain an "inventive concept," transforming the abstract idea into patentable subject matter. To pass step two of the *Alice* inquiry, the claims of the patents must include "additional substantive limitations . . . [that] narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself." *Accenture Globel Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) (quoting *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1282 (Fed. Cir. 2013)).

Without conceding that the its Patents are drawn to abstract concepts, SecureNet argues that if step two of the *Alice* inquiry is required, then four limitations found in Claim 1 of the '837 Patent provide the necessary inventive concepts. These four limitations are: (1) the hierarchy of two or more data storage devices; (2) attribute data representing information about the sensor used to capture the sensory data; (3) weighting of the attribute data; and (4) correlation of primitive events which are weighted by attributed data. SecureNet insists that, together, these disclosed limitations provide technical solutions to problems arising in the field of computerized surveillance systems. *See Data Engine Tech. LLC v. Google LLC*, 906 F.3d 999, 1007–11 (Fed. Cir. 2018) (electronic spreadsheet system or rendering electronic, three-dimensional spreadsheets implemented with generic computer equipment not abstract because of "functional improvement achieved by the specifically recited notebook tabs in the claimed methods"). Thus, per SecureNet, these limitations provide the necessary inventive concepts to satisfy the second step of *Alice*.

Alternatively, SecureNet argues that whether the hierarchy of storage devices, attribute data, weighing, and correlation constitute the necessary inventive concepts is a question of fact that cannot be resolved on a motion to dismiss. *See* Dkt. #27 at 39–40.

Defendant Senstar responds that, at most, SecureNet has described improvements and advancements over prior existing security systems, but Senstar draws a distinction in the context of § 101 between "novelty" and an "inventive concept." Senstar argues that whether the claims are novel and non-obvious is distinct from the search for a § 101 inventive concept because "a claim for a new abstract idea is still an abstract idea" and is not patent eligible. Dkt. #32 at 7. Among other things, Senstar

argues that the hierarchical storage management process cannot provide the requisite "inventive concept" because, as of the 2007 priority date of the asserted Patents, HSM was a routine and conventional way to manage large volumes of data. Senstar further argues that the remaining limitations—weighing of attribute data from sensors and correlating that weighed data for purposes of sending an alert—are merely things that a computer can do better, but which human security guards have always done. *Id.* at 9–10.

Taking guidance from the *Berkheimer* decision, I decline to dismiss SecureNet's Complaint under Rule 12(b)(6). At this stage of the proceedings, I must read the Complaint liberally and draw all reasonable inferences in the light most favorable to the non-movant. *Broker's Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017). Whether the cited limitations of the hierarchy of storage devices, the weighing of attribute data, and the correlating of that data provide the requisite inventive concepts necessary to make Plaintiff's claims patent-eligible under § 101, depends on whether they "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction*, 776 F.3d at 1347–48 (quoting *Alice*, 573 U.S. at 225). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact. Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368 (citing *Microsoft corp. v. i4i, Ltd. P'ship*, 564 U.S. 91, 95 (2011)).

So, while the issue of patent eligibility is ultimately a question of law, based on the allegations here, as well as the contents of the Patents-at-issue, I cannot conclude at this early stage that there is no inventive concept present that could transform the claims such that they might be patent-eligible. "Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." *Id.* at 1369. It goes without saying that the Court was not a "skilled artisan at the time of the patent." Therefore, while on the surface it might appear to be a close question, and an uninformed instinctual reaction might suggest that Senstar has the better side of the argument, I am unable at this point to make the necessary factual determination without additional information. *See generally Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1130 (Fed. Cir. 2018) (reversing trial court's finding of patent ineligibility at 12(b)(6) stage, because amended complaint, at minimum, raised factual disputes underlying the § 101 analysis, such as whether a specific claim term constituted an inventive concept). In this case, just as in *Aatrix Software*, the "question cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice." *Id.* at 1128.

## Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss (Dkt. #12) is **DENIED.** However**,** nothing in this opinion should be viewed as going beyond the Rule 12(b)(6) stage. Summary judgment involves different standards than Rule 12(b)(6). *See Aatrix*

*Software*, 882 F.3d at 1130. Defendant Senstar is free to make its § 101 argument again in the context of summary judgment.

Date: May 20, 2020

N. Reid Neureiter
United States Magistrate Judge